## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN GOSSETT, Derivatively on Behalf of Nominal Defendant POLISHED.COM INC., | Case No.   1:23-cv-1168 |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| DOUGLAS T. MOORE, ROBERT D. BARRY, ALBERT FOUERTI, MARIA JOHNSON, ELLERY W. ROBERTS, EDWARD J. TOBIN, ELLETTEE A. ANDERSON, CLARK R. CROSNOE, PAUL A. FRONING, GLYN C. MILBURN, JAMES M. SCHNEIDER, G. ALAN SHAW, ALAN P. SHOR, and 1847 PARTNERS LLC, | |
| Defendants, | |
| and | |
| POLISHED.COM INC., | |
| Nominal Defendant. | |

Plaintiff Brian Gossett ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Polished.com Inc. f/k/a 1847 Goedeker Inc. ("Polished" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain current and former executive officers seeking to remedy certain defendants' breaches of fiduciary duties and other wrongs.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Polished.com with the U.S. Securities and Exchange Commission

("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Polished, together with its subsidiaries, operates as a content-driven and technology-enabled one-stop shopping destination for home goods, furniture, and appliances.  In addition to its e-commerce platform, the Company purportedly operates fulfillment centers in the Midwest and Northeast as well as showrooms in Brooklyn, New York, Largo, Florida, and St. Louis, Missouri.

2.    Through a series of materially misleading public filings, beginning with the Company's initial public offering ("IPO") in August 2020, the Individual Defendants misrepresented the effectiveness of the Company's internal control over financial reporting.

3.    On August 15, 2022, the Company announced an internal investigation into "certain allegations made by certain former employees related to the Company's business operations." On this news, the Company's stock price fell 35% to close at $0.97 per share on August 16, 2022.

4.    Then, amid the internal investigation, Polished announced that its Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer all resigned from their respective positions.

5.    The truth fully emerged on December 22, 2022 when the Company issued a press release detailing the key findings of its Audit Committee's internal investigations, wherein the Company revealed it would restate first quarter 2022 financials, "reflecting a reduction in revenue of $6 million to $8 million and a related reduction in cost of goods sold of $5 million to $7 million." Among other things, the former Chief Executive Officer charged Polished for approximately $800,000 in expenses unrelated to the Company's operations. On this news, the Company's stock price fell 12% to close at $0.61 per share on December 23, 2022.

6. These revelations precipitated the filing of a securities class action in this District against Polished and certain of the defendants named herein, captioned *Maschhoff v. Polished.com Inc., et al.*, Case No. 1:22-cv-06606 (the "Securities Class Action").

7. Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.    JURISDICTION AND VENUE

8. This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332. Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and the named Plaintiff and Defendants are citizens of different states.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

10. Plaintiff Brian Gossett purchased shares of Polished stock in June 2021 and has continuously owned Polished stock since that date. He currently owns 25,000 shares. He is a citizen of South Carolina.

**Nominal Defendant**

11. Nominal Defendant Polished is a Delaware corporation with principal executive offices located at 1870 Bath Avenue, Brooklyn, New York 11214. On July 20, 2022, the Company changed its name from "1847 Goedeker Inc." to "Polished.com Inc." Before the Company

changed its name, the Company's common stock traded on the NYSE under the ticker symbol "GOED." Now, the Company trades under the ticker symbol "POL."

**Defendants**

12.     Defendant Douglas T. Moore ("Moore") served as the Company's Chief Executive Officer ("CEO") from August 2019 until September 2021 and as a director of the Company from April 2020 until September 2021. Moore was the CEO and a director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement. Moore is named as a defendant in the Securities Class Action. He is a citizen of Virginia.

13.     Defendant Robert D. Barry ("Barry") served as the Company's Chief Financial Officer ("CFO") from January 2019 to July 2021 and the Chief Accounting Officer ("CAO") from July 2021 to January 2022. Barry has served as the Interim CFO since October 2022. Barry is named as a defendant in the Securities Class Action. He is a citizen of North Carolina.

14.     Defendant Albert Fouerti ("Fouerti") served as the Company's CEO from September 2021 through October 2022 and has served as a director of the Company since September 2021. Fouerti is named as a defendant in the Securities Class Action. He is a citizen of New York.

15.     Defendant Maria Johnson ("Johnson") served as the Company's CFO from July 2021 through October 2022. Johnson is named as a defendant in the Securities Class Action. He is a citizen of New York.

16.     Defendant Ellery W. Roberts ("Roberts") was the Chairman of the Board of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement. Roberts has been the Chairman, Chief Executive Officer, President and Chief Financial Officer of 1847 Holdings LLC since its inception on January 22, 2013, and is also the sole manager of 1847 Partners LLC ("Partners LLC"), the Company's external manager.

Roberts has served as Executive Chairman of the Board since August 2021.  Roberts serves on the Company's Strategic Planning Committee. He is a citizen of California.

17.     Defendant Edward J. Tobin ("Tobin") has served as a director of the Company since April 2020.  Tobin has been the managing director of Partners LLC since 2014. He is a citizen of New York.

18.     Defendant Ellette A. Anderson ("Anderson") has served as a director of the Company since July 2020.  At relevant times, Anderson was a member of the Nominating and Corporate Governance Committee. She is a citizen of Minnesota.

19.     Defendant Clark R. Crosnoe ("Crosnoe") has served as a director of the Company since July 2020.  Crosnoe serves as the Committee Chair of the Audit Committee. He is a citizen of Texas.

20.     Defendant Paul A. Froning ("Froning") served as a director of the Company from July 2020 until October 2021. He is a citizen of Illinois.

21.     Defendant Glyn C. Milburn ("Milburn") has served as a director of the Company since July 2020.  Milburn serves as a member of the Company's Audit Committee and the Nominating and Corporate Governance Committee. He is a citizen of California.

22.     Defendant James M. Schneider ("Schneider") has served as a director of the Company since January 2022.  Schneider serves as a member of the Company's Audit Committee. He is a citizen of Texas.

23.     Defendant G. Alan Shaw ("Shaw") has served as a director of the Company since October 2021.  Shaw serves as a member of the Company's Audit Committee and the Nominating and Corporate Governance Committee. He is a citizen of Washington, D.C.

24.     Defendant Alan P. Shor ("Shor") has served as a director of the Company since June 2021.  He is a citizen of Texas.

25.     Defendant 1847 Partners LLC has served as the Company's external manager since April 5, 2019.  Among other things, the Management Services Agreement between the Company and Partners LLC states that the manager shall "conduct general and administrative supervision and oversight of the Company's day-to-day business and operations, including, but not limited to…administration of personnel and personnel benefits, development of administrative policies and procedures… participation in risk management policies and procedure."  As a result, Partners LLC was responsible for the day-to-day business of the Company, including oversight of expense reimbursements and financial reporting. Its principal executive offices are located in New York.

26.     Defendants Crosnoe, Froning, Milburn, Schneider and Shaw are sometimes referred to hereinafter as the "Audit Committee Defendants."

27.     Defendants Moore, Barry, Fouerti, Johnson, Roberts, Tobin, Anderson, Crosnoe, Froning, Milburn, Schneider, Shaw, and Shor are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

28.     By reason of their positions as officers, directors, and/or fiduciaries of the Company, and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Polished and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

6

Each director and officer of the Company owes to Polished and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of Polished, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Polished, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.      To discharge their duties, the officers and directors of Polished were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Polished were required to, among other things, do the following:

(a)      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)      Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)      Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

(d)      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.      Audit Committee Duties and Responsibilities**

31.      According to the Audit Committee Charter, the Audit Committee Defendants were responsible for, among other things, the following:

(i) ***the integrity of the Company's and its subsidiaries' financial statements and financial reporting process and the Company's and its subsidiaries' systems of internal accounting and financial controls, (ii) the performance of the internal audit services function***, (iii) the annual independent audit of the Company's and subsidiaries' financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance, (iv) ***the compliance by the Company with legal and regulatory requirements, including the Company's disclosure of controls and procedures***, (v) the evaluation of enterprise risk issues, and (vi) the fulfilment of the other responsibilities set out herein.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

32.    Polished serves primarily as an e-commerce company with a focus on selling household appliances.  Additionally, the Company owns and operates fulfillment centers across the Midwest and Northeast.

33.    In its IPO, the Company sold 1,111,200 shares of common stock at $9.00 per share. In June 2021, the Company sold 93,111,111 shares at $2.25 per share in a secondary public offering ("SPO").

### B.    The Individual Defendants Cause the Company to Issue a Materially Misleading Registration Statement in Connection with its IPO

34.    On April 22, 2020, defendants Moore, Barry, and Roberts signed and caused the Company to file with the SEC a registration statement on Form S-1 in connection with the Company's IPO.  On August 3, 2020, these defendants caused the Company to file with the SEC the final prospectus for the IPO on Form 424B4.  The final prospectus and any amendments to the registration statement filed on Forms S-1/A, in combination with the registration statement, are collectively referred to as the "IPO Registration Statement."

35.    The IPO Registration Statement included the following financial information:

| | Period April 6 to December 31, 2019 Successor | Period January 1 to April 5, 2019 Predecessor | | Pro Forma Adjustments | Pro Forma Combined Year Ended December 31, 2019 | Year Ended December 31, 2018 Predecessor | Increase (Decrease) |
|---|---|---|---|---|---|---|---|
| Product sales, net | $ 34,668,112 | $ 12,946,901 | | — | $ 47,615,013 | $ 56,307,960 | $ (8,692,947) |
| Cost of goods sold | 28,596,129 | 11,004,842 | | — | 39,600,971 | 45,409,884 | (5,808,913) |
| Gross profit | 6,071,983 | 1,942,059 | | — | 8,014,042 | 10,898,076 | (2,884,034) |
| Operating expenses | | | | | | | |
| Personnel | 2,909,751 | 913,919 | | — | 3,823,670 | 3,627,883 | 195,787 |
| Advertising | 1,996,507 | 714,276 | | — | 2,710,783 | 2,640,958 | 69,825 |
| Bank and credit card fees | 870,877 | 329,247 | | — | 1,200,124 | 1,369,557 | (169,433) |
| Depreciation and amortization | — | 9,675 | (a) | 271,036 | 280,711 | 39,639 | 241,072 |
| General and administrative | 1,557,260 | 451,214 | (b) | 183,790 | 2,192,264 | 1,330,647 | 861,617 |
| Total operating expenses | 7,334,395 | 2,418,331 | | 454,826 | 10,207,552 | 9,008,684 | 1,198,868 |
| Income (loss) from operations | (1,262,412) | (476,272) | | (454,826) | (2,193,510) | 1,889,392 | (4,082,902) |
| Other income (expense) | | | | | | | |
| Financing costs | — | — | (c) | (520,160) | (520,160) | — | (520,160) |
| Gain on write-down of contingency | — | — | (d) | 32,246 | 32,246 | — | 32,246 |
| Interest expense | — | — | (e) | (683,211) | (683,211) | (149) | (683,062) |
| Change in fair value of warrant | — | — | (f) | 106,900 | 106,900 | — | 106,900 |
| Other income | 15,010 | 31,007 | | — | 46,017 | 116,135 | (70,118) |
| Total other income (expense) | 15,010 | 31,007 | | (1,064,225) | (1,018,208) | 115,986 | (1,134,194) |
| Net income (loss) before income taxes | (1,247,402) | (445,265) | | (1,529,051) | (3,211,718) | 2,005,378 | (5,217,096) |
| Provision before income taxes | — | — | (g) | (698,303) | (698,303) | — | (698,303) |
| Net income (loss) | $ (1,247,402) | $ (445,265) | | $ (830,748) | $ (2,513,415) | $ 2,005,378 | $ (4,518,793) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### Summary of Cash Flow

The following table provides detailed information about our net cash flow for all financial statement periods presented in this prospectus.

| | Year Ended December 31, | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|
| | 2019 Successor | 2019 Predecessor | 2019 Total | 2018 Predecessor | 2020 Successor | 2019 Predecessor |
| Net cash provided by (used in) operating activities | $ (2,706,053) | $ 611,268 | $ (2,094,785) | $ 442,074 | $ 958,356 | $ (2,230) |
| Net cash used in investing activities | (2,200) | — | (2,200) | — | — | — |
| Net cash provided by (used in) financing activities | 2,772,723 | — | 2,772,723 | (713,800) | (775,158) | — |
| Net change in cash | 64,470 | 611,268 | 675,738 | (271,726) | 183,198 | (2,230) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | Successor | Predecessor |
|---|---|---|
| | Three Months Ended March 31, 2020 | Three Months Ended March 31, 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (1,285,120) | $ (458,522) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 91,841 | 9,674 |
| Amortization of debt discounts | 209,132 | — |
| Changes in operating assets and liabilities: | | |
| Receivables | 290,707 | 1,349,421 |
| Deposits with vendors | — | (73,771) |
| Merchandise inventory | 310,631 | 562,479 |
| Prepaid expenses and other assets | (14,687) | 2,784 |
| Change in operating lease right-of-use assets | 103,145 | |
| Deferred tax assets | (435,000) | |
| Accounts payable and accrued expenses | 520,364 | (414,733) |
| Customer deposits | 1,270,488 | (979,562) |
| Operating lease liabilities | (103,145) | |
| Net cash provided by (used in) operating activities | 958,356 | (2,230) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Repayment on notes payable | (93,750) | — |
| Net payments on lines of credit | (681,408) | — |
| Net cash used in financing activities | (775,158) | — |
| | | |
| **NET CHANGE IN CASH** | 183,198 | (2,230) |
| **CASH, BEGINNING OF PERIOD** | 64,470 | 1,525,693 |
| **CASH, END OF PERIOD** | $ 247,668 | $ 1,523,463 |
| | | |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | |
| Cash paid for interest | $ 92,398 | $ — |
| Cash paid for taxes | $ — | $ — |
| | | |
| **SUPPLEMENTAL DISCLOSURE OF NON-CASH INFORMATION** | | |
| Adjustment to fair value of goodwill based on final purchase price allocation | $ 121,736 | $ — |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  | Successor December 31, 2019 | Predecessor December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 64,470 | $ 1,525,693 |
| Receivables | 1,862,086 | 2,635,932 |
| Deposits with vendors | 294,960 | 2,212,181 |
| Merchandise inventory, net | 1,380,090 | 3,111,594 |
| Due from officers | — | 50,634 |
| Other assets | 892,796 | 6,784 |
| Total Current Assets | 4,494,402 | 9,542,818 |
| Property and equipment, net | 185,606 | 216,286 |
| Operating lease right-of-use assets | 2,000,755 | — |
| Goodwill | 4,976,016 | |
| Intangible assets, net | 1,878,844 | — |
| Deferred tax assets | 698,303 | — |
| Other long-term assets | 45,000 | — |
| TOTAL ASSETS | $ 14,278,926 | $ 9,759,104 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | $ 2,465,220 | $ 2,860,159 |
| Customer deposits | 4,164,296 | 3,500,268 |
| Advances, related party | 137,500 | — |
| Lines of credit | 1,250,930 | — |
| Current portion of notes payable, related parties | 1,068,075 | — |
| Notes payable | 999,200 | — |
| Convertible notes payable | 584,943 | — |
| Warrant liability | 122,344 | — |
| Current portion of operating lease liabilities | 422,520 | — |
| Total Current Liabilities | 11,215,028 | 6,360,427 |
| Notes payable, related parties, net of current portion | 2,232,369 | — |
| Operating lease liabilities, net of current portion | 1,578,235 | — |
| Contingent note payable | 49,248 | — |
| TOTAL LIABILITIES | 15,074,880 | 6,360,427 |
| Stockholder's Equity (Deficit) | | |
| Common stock, no par value, 30,000 shares authorized, 7,000 shares issued and outstanding as of December 31, 2018 | — | 7,000 |
| Common stock, $0.001 par value, 5,000 shares authorized, 1,000 shares issued and outstanding as of December 31, 2019 | 1 | — |
| Additional paid-in capital | 1,272,195 | 707,049 |
| Retained earnings (accumulated deficit) | (2,068,150) | 2,684,628 |
| Total Stockholder's Equity (Deficit) | (795,954) | 3,398,677 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT) | $ 14,278,926 | $ 9,759,104 |

11

36.     The IPO Registration Statement purported to warn that its internal control over financial reporting may not be effective.  It stated, in relevant part, as follows:[1]

> We are in the very early stages of the costly and challenging process of compiling the system and process documentation necessary to perform the evaluation needed to comply with Section 404. In this regard, we will need to continue to dedicate internal resources, engage outside consultants and adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are functioning as documented and implement a continuous reporting and improvement process for internal control over financial reporting. As we transition to the requirements of reporting as a public company, ***we may need to add additional finance staff. We may not be able to remediate any future material weaknesses***, or to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing process, ***if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective***. If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal controls when they are required to issue such opinion, investors could lose confidence in the accuracy and completeness of our financial reports, which could harm our stock price.

37.     The above statements were materially misleading because they failed to disclose that: (i) Polished lacked effective controls and procedures regarding inventory and management of the Company's funds; (ii) the Company lacked effective internal control over financial reporting; and (iii) as a result of the foregoing, the Company was reasonably likely to restate its financial results.

**C.     The Company Restates Fiscal 2019 and 2020 Financial Results Purportedly Due to a Tax Decision by the Supreme Court**

38.     After the market closed on March 29, 2021, the Company filed a Form 8-K with the SEC.  That Form 8-K expressed, in relevant part, the following:

> On March 26, 2021, the Board of Directors of 1847 Goedeker Inc. (the "Company"), upon recommendation of the Audit Committee and following

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

discussions with management, determined *that the following previously issued financial statements should no longer be relied upon:*

- The *Company's financial statements for the year ended December 31, 2019*;

- The *Company's financial statements for the quarters ended June 30, 2020 and 2019 that were included in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020*; and

- The *Company's financial statements for the quarters ended September 30, 2020 and 2019 that were included in the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2020*.

The Audit Committee discussed these matters with the Company's independent auditors, Friedman LLP, and determined that *the effect of such errors were material*. As a result, the Company has *decided to restate its financial statements* for the year ended December 31, 2019, for the quarters ended June 30, 2020 and 2019 included in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 and for the quarters ended September 30, 2020 and 2019 included in the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2020. The *financial statements noted above should no longer be relied upon. Similarly, related reports, press releases, earnings releases, and investor communications describing the Company's financial statements for these periods should no longer be relied upon*.

39.   Strikingly, the Company partially focused blame of the restatements on the Supreme Court's 2018 decision in *South Dakota v. Wayfair, Inc*., 138 S. Ct. 2080 (2018), instead of its inadequate internal controls.  The Form 8-K stated, in relevant part, the following:

*Like many other companies that sell their products almost exclusively online, the Company concluded that it should accrue a liability for potential sales taxes that might be payable to the states in which it sells its products as a result of the Supreme Court's 2018 decision in South Dakota v. Wayfair, Inc.*, which provided that states may require remote sellers to collect sales tax under certain circumstances. Accordingly, *the Company's financial statements for the year ended December 31, 2019 will be revised to accrue a liability of $2,910,200*, representing a potential liability for sales taxes and penalties of $2,808,000 and interest expense of $102,200.

40.   On this news, Polished's stock price dropped $0.37 per share, or 4%, to close at $8.63 per share on March 30, 2021.

**D.      The Individual Defendants Continue to Issue Materially Misleading Statements**

41.      On May 3, 2021, defendants Moore, Barry, Roberts, Tobin, Anderson, Crosnoe, Froning, and Milburn signed and caused the Company to file with the SEC a registration statement on Form S-1 in connection with the Company's SPO.  On June 1, 2021, the Company filed with the SEC the final prospectus for the SPO on Form 424B4.  The final prospectus and any amendments to the registration statement filed on Forms S-1/A, in combination with the registration statement, are collectively referred to as the "SPO Registration Statement."

42.      Although the SPO Registration Statement noted that the Company had identified material weaknesses in its disclosure controls, it did not disclose what those weaknesses specifically were.  It stated, in relevant part, as follows:

> **We have identified material weaknesses in our disclosure controls and procedures. If we fail to develop or maintain an effective system of controls, we may not be able to accurately report our financial results and prevent fraud. As a result, current and potential stockholders could lose confidence in our financial statements, which would harm the trading price of our securities.**
>
> We have adopted and maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports filed under the Exchange Act is collected, recorded, processed, summarized and reported within the time periods specified in the rules of the SEC. Our disclosure controls and procedures are also designed to ensure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure. As required under Exchange Act Rule 13a-15, our management, including our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2020, have concluded that, due to a material weakness identified in our evaluation, our disclosure controls and procedures were ineffective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

43.     The SPO Registration Statement purported to warn that the Company's internal control over financial reporting may not be effective.  It stated, in relevant part, as follows:

**We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective.**

We will be required, pursuant to Section 404 of the Sarbanes-Oxley Act, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting in the second annual report we file with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. However, our auditors will not be required to formally attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until we are no longer a non-accelerated filer or no longer an emerging growth company if we take advantage of the exemptions available to us through the JOBS Act.

We are in the very early stages of the costly and challenging process of compiling the system and process documentation necessary to perform the evaluation needed to comply with Section 404. In this regard, we will need to continue to dedicate internal resources, engage outside consultants and adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are functioning as documented and implement a continuous reporting and improvement process for internal control over financial reporting. As we transition to the requirements of reporting as a public company, *we may need to add additional finance staff*. *We may not be able to remediate any future material weaknesses, or to complete our evaluation, testing and any required remediation in a timely fashion*. During the evaluation and testing process, *if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective.* If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal controls when they are required to issue such opinion, investors could lose confidence in the accuracy and completeness of our financial reports, which could harm our stock price.

44.     On August 12, 2021, the Individual Defendants caused Polished to file its quarterly financial report with the SEC for the period ended June 30, 2021 (the "2Q21 Report").  The 2Q21 Report was signed by defendants Barry and Moore.  Pursuant to SOX, attached to the 2Q21 Report were certifications attesting to the accuracy of financial reporting, the disclosure of any material

changes to Polished's internal control over financial reporting, and the disclosure of all fraud. These certifications were signed by defendants Barry and Moore.

45.     On November 15, 2021, the Individual Defendants caused Polished to file its quarterly financial report with the SEC for the period ended September 30, 2021 (the "3Q21 Report").   The 3Q21 Report was signed by defendants Barry and Moore.   Pursuant to SOX, attached to the 3Q21 Report were certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to Polished's internal control over financial reporting, and the disclosure of all fraud.   These certifications were signed by defendants Barry and Moore.

46.     On November 18, 2021, the Board issued a definitive proxy statement soliciting stockholder votes at the Company's 2021 annual meeting to be held on December 21, 2021. Among other things, the proxy statement disclosed the following regarding the Company's related party transactions with Partners LLC:

Management Services Agreement

On April 5, 2019, we entered into a management services agreement with 1847 Partners LLC, our manager, which is owned and controlled by Ellery W. Roberts, our Chairman, pursuant to which we appointed our manager to provide certain services to us for a quarterly management fee equal to $62,500. Under certain circumstances specified in the management services agreement, our quarterly fee may be reduced if similar fees payable to our manager by subsidiaries of our former parent company, 1847 Holdings LLC, exceed a threshold amount.

Pursuant to the management services agreement, we must also reimburse our manager for all costs and expenses which are specifically approved by our Board, including all out-of-pocket costs and expenses, that are actually incurred by our or our affiliates on our behalf in connection with performing services under the management services agreement.

The services provided by our manager include: conducting general and administrative supervision and oversight of our day-to-day business and operations, including, but not limited to, recruiting and hiring of personnel, administration of personnel and personnel benefits, development of administrative policies and procedures, establishment and management of banking services, managing and arranging for the maintaining of liability insurance, arranging for equipment rental,

maintenance of all necessary permits and licenses, acquisition of any additional licenses and permits that become necessary, participation in risk management policies and procedures; and overseeing and consulting with respect to our business and operational strategies, the implementation of such strategies and the evaluation of such strategies, including, but not limited to, strategies with respect to capital expenditure and expansion programs, acquisitions or dispositions and product or service lines.

We expensed $187,500 in management fees for the nine months ended September 30, 2021 and 2020 and $250,000 and $183,790 for the years ended December 31, 2020 and 2019, respectively.

Advances

As of December 31, 2019, our manager had funded $33,738 to us in related party advances. These advances were unsecured, bore no interest, and did not have formal repayment terms or arrangements. These advances were repaid from the proceeds of our initial public offering in August 2020.

47.    The proxy statement disclosed numerous related party transactions with defendant

Fouerti:

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases our ability to compete with competitors, including big box appliance and electronics retailers. We own an approximate 5% interest in the cooperative. Additionally, *Albert Fouerti* is on the board of DMI. As such, DMI is deemed to be a related party.

At September 30, 2021, vendor rebate deposits due from DMI were $3.7 million. During the three and nine months ended September 30, 2021, total purchases from DMI, net of holdbacks, were $63.4 million and $91.4 million respectively. At September 30, 2021, deposits at DMI totaled $12.1 million.

At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31.7 million and $22.0 million, respectively, and vendor rebates receivable were $4.7 million and $3.3 million, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175.6 million, vendor rebates $8.2 million, interest income $1.0 million, consulting income $0.3 million, and rent expense $0.7 million. During the year ended December 31, 2019, the following transactions were carried out with DMI: total

purchases $120.3 million, vendor rebates $3.3 million, interest income $1.4 million, consulting income $0.2 million, and rent expense $0.3 million.

Related Party Leases

On June 2, 2021, our subsidiary 1 Stop Electronics Center, Inc. entered into a lease agreement with 1870 Bath Ave. LLC, an entity that is owned by **Albert Fouerti**, a member of our Board and the President of ACI and Appliances Connection, and **Elie Fouerti**, the Vice President of ACI and Appliances Connection, for our premises located at 1870 Bath Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896.37 during the last year of the term. 1 Stop Electronics Center, Inc. is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default.

On June 2, 2021, our subsidiary Joe's Appliances LLC entered into a lease agreement with 812 5th Ave Realty LLC, an entity that is owned by **Albert Fouerti** and **Elie Fouerti**, for our premises located at 7812 5th Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $6,365.40 per month during the first year with annual increases to $8,305.40 during the last year of the term. Joe's Appliances LLC is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default.

On May 31, 2019, our subsidiary YF Logistics LLC entered into a sublease agreement with DMI for our warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month.

48.    According to the proxy statement, as set forth in its charter, the Company's Nominating and Corporate Governance Committee is responsible for, among other things, overseeing compliance with the Company's code of ethics and approving any related party transactions.  Anderson, Shaw, and Milburn were members of the Nominating and Corporate Governance Committee.

49.    The proxy statement disclosed the following about the Board's role in risk oversight:

> *The Board oversees that the assets of the Company are properly safeguarded, that the appropriate financial and other controls are maintained*, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance….
>
> While the Board oversees risk management, company management is charged with managing risk. Management communicates routinely with the Board and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.
>
> *Our Board administers its risk oversight function as a whole by making risk oversight a matter of collective consideration*. Much of this work has been delegated to committees, which will meet regularly and report back to the full Board. *The audit committee oversees risks related to our consolidated financial statements*, *the financial reporting process, accounting* and legal matters, the compensation committee evaluates the risks and rewards associated with our compensation philosophy and programs, and the nominating and corporate governance committee evaluates risk associated with management decisions and strategic direction.

50.     On March 31, 2022, the Individual Defendants caused Polished to file its annual financial report with the SEC for the year ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by defendants Fouerti, Johnson, Roberts, Anderson, Crosnoe, Milburn, Schneider, Shaw, Shor, and Tobin.  Pursuant to SOX, attached to the 2021 Annual Report were certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to Polished's internal control over financial reporting, and the disclosure of all fraud. These certifications were signed by defendants Fouerti and Johnson.

51.     The 2021 Annual Report acknowledged that the Company had a material weakness in its internal controls.  It stated, in relevant part, the following:

> **Material Weaknesses in Internal Control over Financial Reporting**
>
> Management has determined that the Company's ineffective internal control over financial reporting and resulting material weaknesses, *stem primarily from management's inability to maintain appropriately designed controls, which impacts the control environment, risk assessment procedures and ability to detect or prevent material misstatements to the financial statements*. The material weaknesses were attributed to: *lack of structure and responsibility*, insufficient number of qualified resources and *inadequate oversight and accountability over*

*the performance of controls*; *ineffective assessment and identification of changes in risk impacting internal control over financial reporting; inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures*; and *ineffective evaluation and determination as to whether the components of internal control were present and functioning*.

### Management's Remediation Plan

Management is actively engaged in the implementation of remediation plans to address the controls contributing to the material weaknesses. The Company's remediation actions include, but are not limited to, the following: enhance reporting structure and increase the number of qualified resources in roles over internal control over financial reporting; establish formal risk assessment procedures to identify and monitor changes in the organization that could have an impact on internal control over financial reporting; and develop and document policies and procedures, including related business process and technology controls, assess their effectiveness and establish a program for continuous assessment of their effectiveness.

52.    On May 16, 2022, the Individual Defendants caused Polished to file its quarterly financial report with the SEC for the period ended March 31, 2022 (the "1Q22 Report").  The 1Q22 Report was signed by defendants Fouerti and Johnson.  Pursuant to SOX, attached to the 1Q22 Report were certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to Polished's internal control over financial reporting, and the disclosure of all fraud.  These certifications were signed by defendants Fouerti and Johnson.  The 1Q22 Report repeated the previously disclosed material weakness in the Company's internal control over financial reporting.

53.    The above statements were materially misleading because they failed to disclose that: (i) the Company lacked effective controls and procedures regarding inventory and management of the Company's funds; (ii) the Company lacked effective internal control over financial reporting; and (iii) as a result of the foregoing, the Company was reasonably likely to restate its financial results.

E.      **The Truth Slowly Emerges**

54.      On August 15, 2022, after the market closed, Polished announced an internal investigation by the Audit Committee into "certain allegations made by certain former employees related to the Company's business operations." On this news, the Company's stock price fell 35% to close at $0.97 per share on August 16, 2022, on unusually heavy trading volume.

55.      As a result of the ongoing investigation, the Company could not timely file its quarterly reports for the periods ended June 30, 2022 and September 30, 2022.

56.      On October 14, 2022, the Company revealed that defendants Fouerti and Johnson, as well as Elie Fouerti, resigned from their positions as CEO, CFO, and Chief Operating Officer, respectively.

57.      On December 22, 2022, the Company issued a press release entitled "Polished.com Announces Internal Investigation Results, Corporate Updates and the Board of Directors' Remedial Actions."  Within this press release, the Company announced the key findings of its Audit's Committee's internal investigation and stated, in relevant part, the following:

> The Company's Board of Directors (the "Board") has completed its assessment of the results of the Audit Committee's previously disclosed internal investigation. The investigation, which was supported by independent legal counsel and advisors, produced the following key findings pertaining to the Company's business operations under former management during the 2021-2022 period:
>
> • The Company was ***charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations***.
>
> • The Company ***appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements***.  As elaborated on below, the Company has subsequently put in place enhanced controls to remedy and labor issues and believes it is now in full compliance with legal requirements.
>
> • The ***Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient***.  As elaborated on below, the Company has subsequently put in place enhanced controls to remedy such issues.

58.     Therein, the Company also revealed that it would restate its 1Q22 financial results, "reflecting a reduction in revenue of $6 million to $8 million and a related reduction in cost of goods sold of $5 million to $7 million."  The Company estimates that this restatement will result in a gross margin decline and a reduction in operational profit by $1 million to $2 million.  Polished also revealed that its auditor resigned earlier in the week.

59.     In the same press release, Polished stated that it had taken remedial actions, including seeking reimbursement from its former CEO for the non-Company related expenses and for the costs of the Audit Committee's investigation.

60.     On December 27, 2022, the Company filed a Form 8-K with the SEC disclosing, among other things:

> In the Letter, Friedman advised the Company that based on the results of the Company's Board of Directors (the "Board") internal investigation as reported to Friedman, it appears there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation has identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022.

> * * *

> In connection with the Letter, Friedman advised us that it is withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively.

61.     Attached to the Form 8-K was a settlement and cooperation agreement between the Company and defendant Fouerti.  Among other things, the agreement released the Company's claims against Fouerti:

Polished.com hereby releases and forever discharges Mr. Fouerti from and against any and all actions, causes of action, suits, proceedings, debts, expenses, fees, attorney fees, sums of money, accounts, liabilities, losses, bills, controversies, agreements, promises, damages, obligations, awards, deficiencies, executions, claims and/or demands, related to the Audit Committee Investigation. Notwithstanding the foregoing, nothing in this Section 2(b) shall apply to any indemnification claim by Polished.com for any third party or government seeking recovery from Polished.com in connection with any matters identified in the Audit Committee Investigation attributable to Mr. Fouerti's negligence or willful misconduct or any claim against Mr. Fouerti for conduct or additional damages or fines arising from Mr. Fouerti's conduct.

62.     On this news, the Company's stock price fell 12% to close at $0.61 per share on December 23, 2022, on unusually heavy trading volume.

## VI.     DAMAGES TO THE COMPANY

63.     As a direct and proximate result of the Individual Defendants' conduct, Polished has been seriously harmed and will continue to be.  Such harm includes, but is not limited to the following:

(a)     Any funds paid to settle the Securities Class Action; and

(b)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Polished.

64.     In addition, Polished's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

65.     The actions complained of herein have irreparably damaged Polished's corporate image and goodwill. For at least the foreseeable future, Polished will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Polished's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.    Plaintiff brings this action derivatively in the right and for the benefit of Polished to redress injuries suffered, and to be suffered, by Polished as a direct result of the wrongdoing alleged herein.  Polished is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

67.    Plaintiff will adequately and fairly represent the interests of Polished in enforcing and prosecuting its rights.

68.    Plaintiff has continuously been a stockholder of Polished at times relevant to the wrongdoing complained of and is a current Polished stockholder.

69.    When this action was filed, Polished's Board of Directors consisted of nine members, defendants Roberts, Anderson, Crosnoe, Milburn, Shor, Tobin, Shaw, and Schneider and non-party director Houman Akhavan.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.  A majority of these defendants face a substantial risk of liability for, individually and collectively, violating and breaching their fiduciary duties of candor, good faith, and loyalty to Polished stockholders.

70.    Defendants Roberts and Tobin could not disinterestedly consider a demand to take action in connection with the wrongdoing alleged herein.  According to the Company's proxy statements, the Board determined that defendants Roberts and Tobin are independent: "Messrs. Roberts and Tobin are not considered independent because of their affiliation with our manager, 1847 Partners LLC."  Through their affiliation with Partners LLC, Roberts and Tobin would be conflicted in any demand seeking that they investigate and take action in connection with the wrongdoing alleged herein, and demand is excused on that basis.

71.     Defendants Crosnoe, Milburn, Shaw, and Schneider have served as members of the Audit Committee at relevant times.  As such, they are responsible for the integrity Polished's disclosures.  In their capacities as Audit Committee members, Crosnoe, Milburn, Shaw, and Schneider reviewed and approved the materially misleading statements and allowed them to be disseminated in Polished's SEC filings and other disclosures.  The Audit Committee Defendants also face a substantial likelihood of liability for their failure to maintain effective controls with respect to inventory. Thus, Crosnoe, Milburn, Shaw, and Schneider breached their fiduciary duties and are not disinterested, and demand is excused as to them.

72.     Defendants Milburn, Shaw, and Anderson were members of the Nominating and Corporate Governance Committee at relevant times.  Pursuant to the charter of that committee, they were required to oversee compliance with the Company's Code of Ethics and Business Conduct and required to approve related party transactions.  The Code of Ethics and Business Conduct requires, among other things that: (i) "the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules"; and (ii) "Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained."  As set forth above, Milburn, Shaw, and Anderson failed to adequately oversee compliance with the Code of Ethics and Business Conduct as they were required to.  Moreover, Milburn, Shaw, and Anderson approved a litany of conflicted related party transactions with defendant Fouerti, the propriety of which is in doubt due to the conduct alleged above.

73.     Roberts, Tobin, Anderson, Crosnoe, and Milburn signed and issued the SPO Registration Statement failing to disclose the Company's woefully deficient internal controls, including as to the management of Company funds and the procedures for tracking inventory. These internal controls are essential to the Company's operations, so these defendants knew or should have known they were deficient. As a result, they face a substantial likelihood of liability.

74.     Defendants Roberts, Anderson, Crosnoe, Milburn, Shor, Tobin, Shaw, and Schneider released all of the Company's claims against defendant Fouerti and so could not sue him.  Exempted from the release are claims brought as a derivative action.  Thus, as a technical matter, the Board could not pursue additional damages claims against defendant Fouerti in response to a litigation demand, and only a stockholder suing derivatively could do so.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

75.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Polished's business and affairs, particularly with respect to issues as fundamental as public disclosures.

77.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

78.     In breach of their fiduciary duties owed to Polished, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

79.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

80.     As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Polished has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<div align="center">

**COUNT II**

</div>

<div align="center">

**Against Partners LLC for Aiding and Abetting Breaches of Fiduciary Duty**

</div>

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     Partners LLC exploited and aided and abetted the breaches of fiduciary duty of the Individual Defendants.   Specifically, Partners LLC allowed widespread deficiencies in the Company's internal controls over financial reporting, failed to adequately oversee expense reimbursements, and caused the Company to report false and misleading financial results.

83.     As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will sustain significant damages.

84.     As a result of the misconduct alleged herein, the Partners LLC are liable to the Company

85.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Polished, demands judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Polished and that Plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and violations of federal securities laws;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Polished;

D.      Directing Polished to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Polished and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Polished's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Polished to nominate at least three candidates for election to the Board.

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Polished has an effective remedy;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: February 13, 2023          By: */s/ Benjamin I. Sachs-Michaels*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
  prajesh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
E-mail: info@frankcruzlaw.com

*Counsel for Plaintiff Brian Gossett*

**VERIFICATION**

I, Brian Gossett, do hereby verify that I am a holder of stock of Polished.com Inc. f/k/a 1847 Goedeker Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 2/8/2023

______________________________
Brian Gossett